1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                             HOUSTON DIVISION

4    UNITED STATES OF AMERICA                  4:19-cr-0026

5
     VS.                                       August 2, 2023
6                                              Houston, Texas
                                               8:52:17 a.m.
7    ELEXIS KIERRA SIDNEY

8

9

10

11
                               SENTENCING
12
             BEFORE THE HONORABLE CHIEF JUDGE RANDY CRANE
13
                     UNITED STATES DISTRICT COURT
14
     APPEARANCES:
15
     For the United States          Kimberly Leo, AUSA
16                                   U. S. Attorney's Office
                                     1000 Louisiana Street
17                                   Suite 2300
                                     Houston, Texas 77002
18
     For the Defendant              Alex Rosa-Ambert, AFPD
19                                   Office of the Federal
                                        Public Defender
20                                   440 Louisiana Street
                                     Suite 1350
21                                   Houston, Texas 77002

22   Case Manager                   M. Morgan

23   Electronic Recording Operator  Shannon Holden

24   Also Present                   Jennifer Franklin
                                     U. S. Probation Office
25
     Proceedings from official electronic sound recording;
     transcript produced by court approved transcriber.

     DIGITAL SCROLL TRANSCRIPTION                     281.382.9862

1              THE COURT:  All right.

2                   Good morning, everyone.

3                   Please be seated.

4                   All right.  Let me call this morning 19-cr-26,

5    USA versus Elexis Kierra Sidney.

6         MS. LEO:  Good morning, Your Honor, Kimberly Leo on

7    behalf of the United States.

8         MR. ROSA-AMBERT:  Good morning, Your Honor, Alex Omar

9    Rosa-Ambert on behalf of the Defendant.

10        THE COURT:  Good morning, again.

11        MS. LEO:  Your Honor?

12        THE COURT:  Yes.

13        MS. LEO:  If I just may?

14        THE COURT:  You may.

15        MS. LEO:  There is a – there are two victims in

16   regards to this particular case.

17        THE COURT:  Um-hmm.

18        MS. LEO:  One of the parents for Victim No. 2 is

19   actually on her way to the courthouse.  I believe she was

20   stuck in some traffic.

21        THE COURT:  Um-hmm.

22        MS. LEO:  We just spoke to her, and she should be

23   here in about 10 to 15 minutes.

24        THE COURT:  Okay.

25        MS. LEO:  So, I apologize to the Court.  We had told

1   her to be here by nine o'clock.  I don't know if the Court

2   could maybe –

3          THE COURT:  So, you said there were people for both

4   victims.  One of them was her daughter.

5          MS. LEO:  Yes, Your Honor.

6              This is – oh, no.  One was her son.

7          THE COURT:  Her son.

8          MS. LEO:  The other one was –

9          THE COURT:  The two-year-old?

10          MS. LEO:  -- her niece.

11              Her son is the two-year-old.

12          THE COURT:  Okay.

13          MS. LEO:  And then, there is a three-year-old niece.

14              So, the mother of the three-year-old niece is on

15   her way.

16          THE COURT:  Okay.

17              All right.  Well –

18          MS. LEO:  And, Your Honor, if the Court –

19          THE COURT:  Ten or fif- --

20          MS. LEO:  -- wants to go forward, she just –

21          THE COURT:  Now –

22          MS. LEO:  -- may be coming in late, and I'm not sure

23   if she wants to address the Court.

24          THE COURT:  Well, I assume she's coming because she

25   wants to allocute.

4

1          MS. LEO:  That –

2          THE COURT:  Or at least see –

3          MS. LEO:  Yes, Your Honor.

4          THE COURT:  And –

5          MS. LEO:  And she was here the last time before it

6   was reset, and so, she was – she wanted to be present.

7          THE COURT:  Sure.

8          MS. LEO:  And so, I just wanted to bring that to the

9   Court's attention that she should be here in 10 or 15 minutes.

10          THE COURT:  Is that her sister or sister-in-law?

11          MS. LEO:  I believe it would be sis- -- akin to a

12   sister-in-law.

13          MR. ROSA-AMBERT:  It is her sister-in- -- similar to

14   it, Your Honor.  Yes.

15          THE COURT:  Okay.

16          MR. ROSA-AMBERT:  On that note, Your Honor, I do

17   acknowledge that the Court wanted these proceedings to be

18   closed.  However, on – over my left shoulder is my client's

19   family.

20          THE COURT:  Sure.

21          MR. ROSA-AMBERT:  They also want to be present in the

22   proceedings.

23          THE COURT:  Of course.

24          MR. ROSA-AMBERT:  Yeah.

25          THE COURT:  I just don't do porn cases with any other

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  defendants who are going to be back in the same facility,

2  because often it presents security problems.  Those people end

3  up getting victimized.  You have to put them in solitary and

4  keep them away from other -

5          But I understand she's in general population

6  right now, and probably people are aware of what her charges

7  are, so maybe not as important that I follow my own policy in

8  that regard.  But it's really just to keep them away from

9  other prisoners.

10          So, I'm happy to recess for 10 minutes or 15

11  minutes.

12      MS. LEO:  If the Court could that would be -

13      THE COURT:  Sure.

14      MS. LEO:  -- greatly appreciated just because I know

15  she's on her way, and - and she was present the last time.

16      THE COURT:  Okay.

17          Well, let's give her a chance to be here.

18  Obviously, this is a big deal to her that her child was

19  victimized like this.

20          All right.  Then, we'll be in recess for 10

21  minutes or so.

22      MS. LEO:  And I apologize to the Court about this,

23  Your Honor.

24      THE COURT:  No, it's not your fault.

25          All right.  So, just let my Case Manager or

1   someone know, and they'll come get me.

2          MS. LEO:  Yes, Your Honor.

3          THE COURT:  All right.

4          MR. ROSA-AMBERT:  Thank you, sir.

5          THE COURT:  Thanks.

6                 We'll be in recess.

7      (Recess taken at 9:00:19 a.m.)

8      (Proceedings resumed at 9:21:30 a.m.)

9          THE COURT:  All right.

10                Good morning, again.

11                Please be seated.

12                All right.  Let me recall 19-cr- -- 19-cr-52- --

13  is that 6- -- sorry -- 19-cr-26, USA versus Elexis Kierra

14  Sidney.

15                Announcements for the Government?

16          MS. LEO:  Good morning, Your Honor.  Kimberly Leo on

17  behalf of the United States.

18          THE COURT:  And again, for the Defendant?

19          MR. ROSA-AMBERT:  Good morning, Your Honor.

20  Alex Omar Rosa-Ambert on behalf of Ms. Sidney.

21          THE COURT:  Great.

22                All right.  So, Ms. Sidney, there was a

23  Presentence Report prepared about you in your case.  I just

24  need to make sure you got a chance to review that with your

25  lawyer.

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1          DEFENDANT SIDNEY:  Yes, sir.

2          THE COURT:  Perfect.

3               Okay.  And let's see third acceptance point off.

4               I assume the Government would move for that?

5          MS. LEO:  The Government so moves.

6          THE COURT:  Which I grant.

7               All right.  Anything you want to say on behalf

8  of your client?

9          MR. ROSA-AMBERT:  Yes, Your Honor.  I don't want to

10  belabor what I stated in my – on both the memos that I filed

11  in this case.

12          THE COURT:  Yeah.  I did read and re-read – I got

13  ready last time – and then, I re-read your lengthy memo, the

14  Government's lengthy response, your lengthy reply that I think

15  came in yesterday.

16               And I've read all the attachments; I've read the

17  initial information on the victims who – who filed victim

18  impact statements.  And I've read the psychological reports as

19  well on your client.

20          MR. ROSA-AMBERT:  Yes, Your Honor.

21          THE COURT:  So, I'm familiar with all of that.

22          MR. ROSA-AMBERT:  I –

23          THE COURT:  And any points you want to make, though,

24  please feel free.

25          MR. ROSA-AMBERT:  I would have thought by reference

1   what I stated in my memo, so I do want to say that I think

2   that this case is – that one case that is a struggle for – for

3   all of us, Your Honor.

4               Just to provide context to the Court – as the

5   Court can see, this case is from 2019.

6           THE COURT:  Um-hmm.

7           MR. ROSA-AMBERT:  I arrived at the Public Defender's

8   Office in late 2021.  The case wasn't moving at all, and I

9   think that Ms. Leo and I did our very best to move it along

10  just because, again, it's such a difficult case to handle,

11  right.

12          THE COURT:  Um-hmm.

13          MR. ROSA-AMBERT:  This is that unique case where we,

14  obviously, feel sympathetic towards the victims.  The facts

15  are – let's say – complex.

16              However, I think that the real question before

17  the Court is not whether the facts reflect the Guidelines that

18  were imposed in this case.  We're not objecting what the

19  Guidelines are.  What we are trying to convince the Court of

20  is that there are circumstances that led to this and the Court

21  should vary to give the Defendant an opportunity to come – to

22  go back to the community.

23              I do believe that Ms. Sidney is redeemable.  I

24  think that the first fact that would be reflective of that is

25  that her family is here, even though this is family that now

1  takes care of one of the victims in the case.

2              Again, we're not trying to minimize what

3  happened.  I do believe that they now understand and have a

4  better grasp of what she suffered through in her early years,

5  not only with she being a victim herself but also with the

6  whole mental struggles that she was enduring.  We don't even

7  know that the costs of those mental health struggles were the

8  fact that she had been a victim of the past, that it's –

9  obviously remains to be seen; we just don't have the resources

10  to engage in that particular type of study.

11              But I do believe that, again, considering her

12  circumstances, considering that she was, not only once but

13  twice in a mental health institution with suicidal ideations

14  before this happened.

15              The fact that she was groomed once she was

16  assaulted as a child then groomed as a man when she was only

17  12 years old I think that I need to take objection to the

18  Government and this idea that she should have known better.

19  That's precisely the problem, Your Honor.  She doesn't fully

20  understand or grasp the extent of the trauma that she

21  suffered.  And there's a godzillian studies about that.  I

22  don't think – and I don't want to belabor that.  I think that

23  the Court is aware of that.  But it's – it – I – science needs

24  to account for something.

25              THE COURT:  Sure.

1          So – I guess a couple of things.  I did have a
2    curiosity why this type of case has been here for four years.
3    I mean, these are normally one-year cases.  The facts are
4    obvious.  I mean, they catch people red-handed.  Here, we had
5    a confession.  The forensic report comes back pretty – I mean,
6    this one, especially, is pretty simple.  Forensics would have
7    come back in a couple of months.

8          And what – I mean, you – obviously, need to get
9    a psycho-sexual evaluation, which was done.

10          It seems like – it's strange.

11     MR. ROSA-AMBERT:  Again, Your Honor – but I can only
12    account for the two years that I handled the – this case,
13    which is essentially now that it's two years.

14          Before that, I think that the Pandemic had a lot
15    to do with it, the lack of access to the client.  For me, it
16    took me a while to be able to talk to the client, because she
17    was so closed.  She didn't have any relationship with the
18    counsel that preceded me, and that – there was a whole trust
19    that needed to be gained.  But the prosecution and I were in
20    constant communication trying to resolve this.

21          THE COURT:  So –

22          MR. ROSA-AMBERT:  I just – I just think we're all –

23          THE COURT:  Yeah.  It doesn't like ya'll are on the
24    same page at all.  You said, we worked together to resolve
25    this, but ya'll seem quite antagonistic.

1          MR. ROSA-AMBERT:  We - we couldn't reach a resolve.

2          THE COURT:  Sure.

3          MR. ROSA-AMBERT:  But we were in communication is

4    what I'm trying to say.

5          THE COURT:  Okay.

6          MS. LEO:  Your Honor, the only thing I would just add

7    is that Mr. Rosa-Ambert is the third defense attorney on this

8    case, and back in March of 2020, right before the Pandemic -

9          THE COURT:  Uh-huh.

10          MS. LEO:  -- the Defendant was actually set up to

11   plead guilty when she was represented by another one of the

12   Public Defenders, John Parris.  He then left.  I believe there

13   was another FPD appointed, and then Mr. Rosa-Ambert.

14          THE COURT:  That was some of the reason.

15          MS. LEO:  So, that's -

16          THE COURT:  Some of the reason.

17              Okay.  So then, the other questions I have -

18              So, she was institutionalized twice.

19          MR. ROSA-AMBERT:  Yes, sir.

20          THE COURT:  One of your arguments is that she - this

21   was untreated.  But if she's in a mental health institution,

22   why wouldn't this childhood sexual abuse that she suffered

23   come out and have been treated?

24          MR. ROSA-AMBERT:  I - I think that the real answer to

25   that is two-fold, Your Honor.

1          One is that victims struggle a lot divulging

2   what happened, even with treatment.  When she went to those –

3   to those institutions was for medical emergencies and they

4   treated for that, like they treat her there for suicidal

5   ideations.

6          I will also point to the fact that she admitted

7   or she divulged the fact that she was sexually assaulted twice

8   as a child before I got the case.  That's information that I

9   received.  And it was not something that was developed through

10  the psychological evaluation.  This is information that she

11  gave to her mom in 2019 when they started communicating after

12  she was detained.

13         So, I think that the main reason why that

14  information is not necessarily included in those

15  institutionalizations is because, again, they treat her for

16  the symptoms she comes announcing or which, again, were

17  suicidal ideations.

18         THE COURT:  Okay.

19         Just – yeah, there's a pattern to these cases.

20  It seems like many of them soon after they've been arrested

21  and they're facing these enormous consequences that they

22  reveal, oh, I was sexually abused as a child.  And here, she

23  had many opportunities along the way –

24         I mean, when she's 12 years old, usually by then

25  they're old enough to cry out to mom or a counselor about what

1    happened.  But then, again, she had these other periods in her

2    life where she was getting mental health treatment.  If this

3    was – this problem that she had been carrying – this had such

4    an enormous weight on her that that would have come out in one

5    of these institutionalizations, just –

6          MR. ROSA-AMBERT:  Again, I think, Your Honor –  I

7    don't want to be a methodical –

8          THE COURT:  Yeah.

9          MR. ROSA-AMBERT:  But I think experience to me,

10   specifically, has shown me otherwise.

11          My dad committed suicide when I was 21, and I

12   lived with him all my life, and I wasn't aware that he had

13   mental health problems until after he committed suicide.  And

14   this – this is not someone that I see infrequently.

15          THE COURT:  Right.

16          MR. ROSA-AMBERT:  This is a person that I interacted

17   with on a daily basis, and I was led to believe that he just

18   had anger-management issues, which obviously, was a gross –

19          THE COURT:  Sure.

20          MR. ROSA-AMBERT:  -- mis-understating of – of the

21   gravity of the problem.  It's really difficult to say when a

22   victim or someone that is having mental health problems will

23   actually come out and say, that there's a lot of more recent

24   studies – especially from – there's a new institute in Harvard

25   that deals with the intersection of the brain on the law,

1   saying that there are portions of the brain that are triggered

2   in certain circumstances, specifically in child pornography

3   cases.  They're still – they're still trying to figure out

4   why.

5           But right now, you want me to answer a question

6   that – as to why she didn't divulge that before; I don't know.

7           THE COURT:  Only because she was in a setting that

8   called for that.  At least twice she was in a setting.

9           MR. ROSA-AMBERT:  I fully understand that.

10          THE COURT:  Yeah.

11          MR. ROSA-AMBERT:  But that's why, again, I – I gave

12   the example.

13          THE COURT:  Sure.

14          MR. ROSA-AMBERT:  But, like, that doesn't

15   necessarily – doesn't necessarily apply in practice.  When we

16   take into the field, into actual human interactions it doesn't

17   necessarily apply that way.

18           I do believe that the more important pointer

19   would be the fact that she not – that she did not divulge it

20   to the people at the jail.  She told her mom.

21          THE COURT:  Uh-huh.

22          MR. ROSA-AMBERT:  So, this – this was not trying to,

23   again – if – I – I wouldn't understand the Court's concern if

24   she had just said this for the first time when she got into a

25   psychological evaluation, but that was not the case when she

1  was arrested.  And she started to – let's say – rebuild her

2  relationship with her mother was when she told her, yes, mom,

3  I did this horrible thing.  I'm really apologetic for it.

4  However, these are my circumstances.

5          The other factor that I wanted, again, to

6  highlight to the Court is – I – I tried to provide the Court

7  some contents – some context as to the national trends of –

8          THE COURT:  Sure.

9          MR. ROSA-AMBERT:  -- sentencing in these type of

10  cases saying, and this is our unicorn.  We get very few female

11  CP cases, much less with the circumstances of something here.

12          Again, I've been in this office for two and a

13  half years.  Before that, I was in Puerto Rico for – 13?  And

14  this is the first female CP case I've ever had.

15          So, that's why I wanted to highlight the fact

16  that these are so unique.  There's only been 74 in the nation

17  in the last five years.  Out of those, the average sentence

18  has been 297 months of imprisonment, with the same sort of –

19  sort of circumstances that the victim has --  had control

20  ov- -- I'm sorry that the Defendant had control over the

21  victim, that –

22          THE COURT:  And traded the porn –

23          MR. ROSA-AMBERT:  Yes.

24          THE COURT:  -- and then distributed it.

25          MR. ROSA-AMBERT:  Created – distributed, same set of

1    facts.

2              THE COURT:  Sure.

3              MR. ROSA-AMBERT:  Those facts are included in my

4    memo.

5                   And even if we remove the gender fact out of the

6    equation, the 779 total CP defendants that had been sentenced

7    on these same set of circumstances the average sentence for

8    those has been 360 months of imprisonment.

9                   The ones that have been sentenced for life have

10   either – have other prior criminal history or have monetized

11   this CP that they created.  That was definitely not the case

12   here.

13                  And again, concerning the fact that she had a

14   lot of mental health history, that she had also controlled

15   substances, abuse problems.  She mentioned and she described,

16   and – when she used certain drugs she felt invincible was the

17   quote that she used, that she had this proclivity towards

18   being influenced by older males.  And as you read from the

19   report, she started producing this when some males in that Kik

20   chat started telling her that this was okay, that it was –

21   this was common place.  We, obviously, know that that's not

22   the case, and she understand that – understands that now.

23                  But in order for her to fully comply with her

24   debt to society, she will need treatment.  She will need

25   conditions, and there's going to be a point where she's not

1   going to get those while at BOP.  So, the question before the

2   Court is that are we imposing punishment solely on the facts

3   of the case and we're being punitive – I don't want to say for

4   the sake of it – but at some point we do believe that she will

5   definitely be redeemable.

6            And I – I am concerned that the Government's

7   suggesting that a sentence of 60 months would be lenient.

8   That's not the fact of –

9        THE COURT:  Sixty years.

10       MR. ROSA-AMBERT:  Sixty years.

11       THE COURT:  Yeah.

12       MR. ROSA-AMBERT:  It's not the fact to life sentence,

13   Your Honor.  She's about to turn 30.

14       THE COURT:  Uh-huh.

15       MR. ROSA-AMBERT:  So, let's say that she gets all the

16   full credit –

17       THE COURT:  Free her – sure.

18       MR. ROSA-AMBERT:  She's going to be 82 by the time

19   she comes out.  So, that – that would be my main concern.

20   I – I do understand that the Court needs to impose a heavy

21   sentence –

22       THE COURT:  Sure.

23            Let me – on that line, let me just ask a few

24   questions to Ms. Leo.

25            So – I guess first of all why did you plead

1   her – why did she plead to four or five Counts as opposed to

2   just one?  Was it the desire of the Government to – to request

3   stacking?  Is that, basically, what it came down to?

4          MS. LEO:  No, Your Honor.

5             She pled guilty – actually, both Defense counsel

6   and I spoke about her pleading guilty to a plea agreement or

7   to her pleading straight up, and it was her choice to plead

8   straight up.

9             In regards to the case, if she would have pled

10  guilty to a plea agreement, we would have probably dropped the

11  receipt charge or the possession charge.  I don't recall off

12  the top of my head.

13         THE COURT:  Uh-huh.

14         MS. LEO:  But she would have pled guilty to, for

15  sure, the production –

16         THE COURT:  Right.

17         MS. LEO:  -- and the distribution and more than

18  likely probably the possession.  So, again, we would have been

19  still –

20         THE COURT:  Able to stack them still –

21         MS. LEO:  Yes, Your Honor.

22         THE COURT:  -- to this point?

23             Okay.  Okay.

24         MR. ROSA-AMBERT:  Yes.  Yes, Your Honor.

25         THE COURT:  But that's – that was the reason why she

1   pled to more than one Count was because ya'll wanted – ya'll

2   knew that you – there was going to be stacking?

3           MS. LEO:  In most of our cases, they plead to more

4   than one Count.

5           THE COURT:  Okay.

6           MS. LEO:  So, that's the general practice if the

7   conduct fits –

8           THE COURT:  Sure.

9           MS. LEO:  -- it, then, that's what we – we offer in a

10  plea agreement.

11          THE COURT:  Okay.

12          MR. ROSA-AMBERT:  Yes, Your Honor, we – there were –

13  the sentence to plea –

14          THE COURT:  Let me – I have one more question for

15  Ms. Leo.

16          MR. ROSA-AMBERT:  Yeah.

17          THE COURT:  So, the – I guess the most egregious

18  offense, a conviction has a 360-month max.  Isn't that what

19  Congress decided was the stiffest sentence that should be

20  given for this type of offense?

21          MS. LEO:  Your Honor, what the Defendant actually

22  pled guilty to as far as the production – she was only charged

23  with one Count of production for the two-year=old child, minor

24  Victim No. 1.

25          THE COURT:  Uh-huh.

1          MS. LEO:  There was also a second victim.

2          THE COURT:  Right.

3          MS. LEO:  So, the Government did not charge her with

4    that second victim, which would have been an additional 30

5    years that the Court then could have used to stack as well.

6    So, as far as the statutory max, yes, that is the statutory

7    max on just a straight-up production case.

8                Here, this is different.  This is not just a

9    straight-up production case.  We have two victims, and we have

10   this occurring at multiple times.  Because technically, we

11   could have charged the Defendant with each and every time she

12   produced –

13          THE COURT:  Of course.

14          MS. LEO:  -- a video.

15          THE COURT:  Sure.

16          MS. LEO:  And she did that, I believe, and 19 times –

17   she produced 19 videos, and I believe, 17 images of her abuse

18   of –

19          THE COURT:  MV 1.

20          MS. LEO:  -- the two-year-old, of MV 1.  And then she

21   produced, I believe, two images of MV 2.  And so – who was

22   three at the time.

23          THE COURT:  Sure.

24          MS. LEO:  So, as far as being a statutory maximum,

25   yes, that is 30 years.  But that can also be in different

1  circumstances.

2          Here, especially as minor Victim No. 1, there

3  were sex acts that were being performed.  There was fondling;

4  there was oral sex.  It wasn't just lewd and lascivious.  So,

5  looking at it, Your Honor, that's why the Government believes

6  that a sentence of over the 30 years would be appropriate

7  because of the various conduct, plus she didn't just

8  memorialize her abuse of both minor Victim 1 and 2.  She went

9  ahead and distributed that abuse, and she uploaded it.  And at

10  least one time that we know of to a Kik chat group she

11  distributed three of the videos.  And we know that those

12  videos will live on forever.  So, the conduct is not just her

13  recording her sexual abuse it's also the distribution of that

14  abuse to other individuals.  And who knows if they pass it on

15  to other individuals.

16          THE COURT:  Probably.

17          MS. LEO:  We don't know.  We just know that it's out

18  there forever.

19          THE COURT:  Sure.

20          The temporal length of this production – I was

21  trying to figure out, well, when was it – because they seek –

22  they acted very quickly in arresting her, but then when they

23  did the forensics on her it went back – I was trying to figure

24  out, well, how temporal –

25          MS. LEO:  I believe – I believe it went back about

22

1    six months.

2                  Now, her – her statement to law enforcement I

3    believe she says she's being doing this for about a year.  She

4    also tells that to Dr. Hays (phonetic) in the psycho –

5           THE COURT:  Sure.

6           MS. LEO:  -- psychological evaluation.  And when

7    she's discussing this with the individuals on Kik, she says

8    she's been doing this for about a year, that it took about a

9    year for her to be able to warm up to get her son to engage in

10   these types of activities.

11          THE COURT:  Okay.

12                 And – okay.  So, you have answered those

13   questions.

14                 Her – I found kind of disturbing is the report

15   from the psychologist, who, in particular page 13 – this is

16   sort of what I look for in these reports is likely propensity

17   to reoffend, and he gave her a pretty high propensity to

18   reoffend.

19                 Let me see.  It was on page –

20          MR. ROSA-AMBERT:  It was moderate to high, Your

21   Honor.

22          THE COURT:  Page 13 shows likelihood of pedophilia

23   recidivism is my note.

24                 Let's see.

25                 There's also a pedo- -- where she revealed the

1   presence of pedophilic interest that provided the basis for a

2   violation of appropriate sexual boundaries with her young son.

3   She recalled feeling sexual attraction towards a toddler when

4   her mother babysit, and her friend was around 10 years old.

5   She believes her pedophiliac interests have always been

6   present, and speculates that she might have been sexually

7   abused as a toddler.  But there was no evidence of such abuse

8   at the time of the present evaluation.  Her pedophiliac

9   interest do not appear to be fixed, meaning her sexual

10  interest is not exclusive with children.  She also has sexual

11  attraction towards adults, but research has shown that sexual

12  interest in children is a strong predictor of sexual

13  recidivism.

14          I guess that's – so, he's saying she continues

15  to have pedophiliac sexual interests and that that's a strong

16  predictor of sexual recidivism.

17      MR. ROSA-AMBERT:  I fully understand that, Your

18  Honor.  And as I addressed in my memo, there are two factors

19  that the Court needs to consider.

20          One, she remains untreated as to that.  There's

21  a whole system in place at BOP to avoid – or to lessen that

22  risk –

23      THE COURT:  Sure.

24      MR. ROSA-AMBERT:  -- of recidivism.

25          The other factor that the Court needs to

1    consider is her age when – whatever sentence the Court

2    imposes, she's not – definitely not going to be in her

3    twenties; her sexual drive is not going to be the same.

4         THE COURT:  Well, I have CP cases with 70-year-old

5    men.

6         MR. ROSA-AMBERT:  I – I understand that, Your Honor.

7         THE COURT:  At least I've had one that I can think of

8    off the top of my head.

9         MR. ROSA-AMBERT:  There's a lower risk of recidivism

10   in women, too, so that's also a factor, right?  They – they

11   don't have the power to, like, promote or continue in this

12   type of conduct like normally men would.

13            So, I – I think that the risk of recidivism can

14   be tender or treated by, again, BOP's institutionalization and

15   the treatment that they provide for her, and they will also

16   make sure to inform the Court as to whether she complies with

17   that treatment or not and whether they do believe that the

18   risk has lowered.

19            Moreover, the Court can put stricter conditions

20   because at the end of the day, Your Honor, her family's here

21   but, obviously, the two victims that she interacted with will

22   never, ever, ever have a contact with her anymore.

23            And I think – again, I'm not making light of

24   what happened.  I have never tried to live in this case but

25   the fact that she will never have contact with her son is a

1  very, very harsh punishment that she brought on herself.  I'm

2  not disputing that.  But she won't have access to the victims

3  anymore, and I think that should give the Court some solace as

4  to whether she will re-offend in the future.

5         THE COURT:  Well, I mean, she may or may not.  I

6  mean, sometimes, you know, for the sake of the victim it may

7  be as cathartic that they have a confrontation or a discussion

8  with the perpetrator.  I mean, I always permit – well, I

9  generally, no contact with any of the victims, but a family

10 member, since I had a recent mother with her create – a very

11 similar case to this – create CP with her daughter and a

12 boyfriend of the mom's, but I permitted with the consent of

13 the Court's contact, which is probably what I'll do here.

14         But again, back to my point, it seemed to me

15 that the author was very concerned about her propensity to

16 recidivate, because she continues to have sexual thoughts

17 about children.  So, that's something that can be treated so

18 that she can be taught not to act on those, but she still –

19 it's who she is.  Her sexual orientation is what it is.  And

20 that can't be treated out of her.

21         MR. ROSA-AMBERT:  But the risk can be lowered, Your

22 Honor.

23         THE COURT:  Uh-huh.

24         MR. ROSA-AMBERT:  I – I think that that's the

25 question before the Court, whether that risk of re-offending

1    will lower with age and with treatment.  And I think that

2    there is information on the record to show that the answer is,

3    yes, I think that – again, I had this case for two and a half

4    years.  She's way more reflective of the circumstances that

5    she faces now than she was before.

6              The mere fact that she acknowledged that she has

7    those interests would not have happened in 2019.  I think that

8    the fact that she is more than willing to go through the

9    process and acknowledge that she has a problem, seek

10   treatment, be able to talk about what happened to her as a

11   child, the fact that she was groomed by an adult, that she was

12   led to this office by other males in the Kik chat.  That does

13   show a desire or an interest to do better.

14            THE COURT:  Well, she was led to create, but she

15   joined –

16            MR. ROSA-AMBERT:  Yes, voluntarily.

17            THE COURT:  -- on her own.

18            MR. ROSA-AMBERT:  Yes.

19            THE COURT:  She already had her –

20            MR. ROSA-AMBERT:  Yes.

21            THE COURT:  -- again, this pedophilic interests.  And

22   according to the psychiatrist, she's had those pedophilic

23   interests since she was 10 years old.  It's just who she is.

24   It's her sexual orientation.  Anyway that was a concern of

25   mine.

1              I keep asking the questions.  I don't mean to

2     throw you off what you wanted say.  If there's anything you

3     want to address.  These were just concerns that the Court has

4     that I wanted to express so that you could make sure you

5     addressed them, but if there's anything else –

6              MR. ROSA-AMBERT:  I think that the Court read my

7     memos –

8              THE COURT:  Yes.

9              MR. ROSA-AMBERT:  The Court understands my position.

10    I do not believe –

11             THE COURT:  Sure.

12             MR. ROSA-AMBERT:  -- this is the case where life

13    should be a sentence imposed, Your Honor.  Again, the cases

14    that I found and the statistical models provided by the U. S.

15    Sentencing Commission show that the people that get life are

16    the most severe offenders with – and with more criminal

17    history.

18             THE COURT:  Sure.

19             MR. ROSA-AMBERT:  With prior severe criminal history

20    of a similar or akin conduct that monetize their interests.

21                  For example, like the person that you recently

22    sentenced.  I had the opportunity read that transcript.  I –

23    I – that's why I understood the Court's questions.

24                  But, again, we believe that's she's redeemable.

25    I think that the fact that her family is here means that

1   instead of hating her for what she did is reflective of that

2   fact.

3          THE COURT:  Sure.

4          MR. ROSA-AMBERT:  And considering her age and her

5   circumstances, again her mental health that can be treated now

6   that was not treated before, I do believe that a sentence – I

7   request 20 years would be sufficient but not greater than

8   necessary to comply with the requisites of 3553(a).

9          THE COURT:  All right.

10             I'll consider that.

11             And, Ms. Sidney, you're here to speak as well

12   today.  You don't have to, but if there's anything that you

13   would like to say that you want me to consider, now is your

14   chance to speak.

15          DEFENDANT SIDNEY:  Yes, sir.

16             Thank you for allowing me to speak.

17             I'm not – I don't want to sit here and try to

18   make excuses or, you know, or justify anything that I did.

19   Like he said, I experienced things, and the seed was planted.

20   And while, yes, these are things that I have thought about

21   it – it's not – sorry, I have a hard time speaking in front of

22   people.

23             But it's just – I was – I was going through a

24   lot, and self-medicating and it just – it made it real easy

25   for me to, I guess, allow myself to be manipulated, but that's

DIGITAL SCROLL TRANSCRIPTION                         281.382.9862

1  on me.  I can't – you know – nobody else did it.  That's –

2  that's on me.  And – but I just want people to just try to

3  understand what – where my head was at.

4              And I have had a lot of time to sit and think

5  about what I did.  There's not a day that goes by that I don't

6  think about what I did.  And – I can't take it back.  I

7  can't – I wish I could, but I can't.

8              And I have to apologize to, you know, my son and

9  Catherine and for any of the – any trauma that – future trauma

10  that I'm going to cause or any pain that I have caused

11  anybody.  It was not my intent to cause any harm or anything.

12  I –

13              Despite what the evaluation said, too, I have no

14  desire to want to repeat any of what I did.  Like, I – I was

15  honest about a lot, but the desi- --  I don't have that desire

16  to do any of that.

17              I just – would like just a chance to prove that

18  I – I'm better than that, because – I'm not a – I'm not a bad

19  person.  I'm not a person that's going to go around picking

20  kids – I'm not – like, that's not me.  I'm not going to do

21  that.  And I just – I just would like just a chance to prove

22  that – that I could just be better.

23              THE COURT:  I mean, there were two victims here.  So,

24  it's almost like, yes, you did go out and pick another kid.

25  That just happened to be a relative.  Generally, the victims

1    are well-known or the child of a lover or the child – you,

2    know, the biological child of the perpetrator.  Here, was a

3    child of a relative that was victimized.  So, I see that as

4    you did go out –

5             DEFENDANT SIDNEY:  I di- --

6             THE COURT:  -- and prey on another child.

7             DEFENDANT SIDNEY:  I did.

8             THE COURT:  And – and that's why one of your

9    restrictions is going to be you're never going to be allowed

10   around children.

11             You have this sexual desire.  It's – it's your

12   orientation.  It's who you are, and you – you know, when

13   you're on drugs, you're self-medicating, your judgment's poor,

14   and you could act out on that.  And that's – that's the worry

15   is – when you're here, you're sober.  You're thinking

16   rationally.  You know this is something you shouldn't be

17   doing.  But the worries you're going to be – in a moment a

18   weakness that you might act out on – on your sexual

19   orientation is a concern on the Court.

20             And I didn't mean to cut you off.  If I – if I

21   did, I didn't mean to.

22             I did want to add that – you know – one of the

23   Government's positions here – and I don't know if you've been

24   permitted to read their responses – but – is that if you were

25   a victim of sexual abuse then you were – you would be aware of

1    the trauma, the lifetime of trauma that it's going to have

2    on- on your victims and that – and that was something,

3    obviously, you just didn't consider at the time is what effect

4    this would have.

5              I mean, I know you're apologizing to them now,

6    but it will have an effect on them the rest of their lives,

7    especially to MV 1, whose – these videos are out on the

8    internet, so no doubt being distributed and traded amongst

9    these traffickers.

10             Sorry, I didn't mean to cut you off.

11        DEFENDANT SIDNEY:  No, you're fine.

12        THE COURT:  Go ahead if there's anything more you

13   want to say, and then, the Government's going to get to weigh

14   in.

15        DEFENDANT SIDNEY:  No, I'm through.

16        THE COURT:  Okay.

17             Yeah, I wanted to look quickly – there were a

18   number of – not a lot but there were at least a few large

19   victims series that requested restitution.  So, I need to

20   ad- -- I need to address that.  I'm trying to – I think I just

21   saw three – yes, one, two, three.  Okay.

22        MS. LEO:  I believe, Your Honor, there are seven

23   victims that are seeking restitution.

24        THE COURT:  Seven?

25             So, the PSI ha- -- at paragraph 106 only listed

1  three, and in the attachments I thought I only saw two, maybe

2  three.  Six –

3         MS. LEO:  Sorry, Your Honor, six.  I can't count.

4         THE COURT:  Six?

5         MS. LEO:  Yes, Your Honor.

6         THE COURT:  Is Mr. Garcia here, the author of this

7  Presentence –

8         MR. ROSA-AMBERT:  Mr. Garcia is no longer at the

9  USPO.

10         THE COURT:  Oh, wow.  This is that old?

11              So, who's covering for him?

12         PROBATION OFFICER:  Your Honor, Jennifer Franklin

13  with the U. S. Probation.  I have been reassigned to this

14  case.

15         THE COURT:  And I only have three documented in the

16  Presentence Reports.

17         PROBATION OFFICER:  There was – there were three

18  documented in the Presentence Report, and then, there were

19  three additional ones –

20         THE COURT:  Okay.

21         PROBATION OFFICER:  -- that were mentioned in the

22  third addendum.

23         THE COURT:  Okay.

24         PROBATION OFFICER:  So, we have a total of six

25  victims.

1           THE COURT:  Okay.

2           PROBATION OFFICER:  And that new total restitution

3    amount is available in that third addendum.

4           THE COURT:  Okay.

5              All right.  So, Ms. Leo, the Government gets to

6    speak last.  I know you've answered a number of my questions.

7    I've read your memo – actually, before I let you have the

8    floor, I do have some questions.

9              Obviously, there are a number of citations to –

10   a bunch of Houston cases of sentences that were, basically,

11   720 months or more, one of them a 1,000 months, had a one-

12   sentence on – that one was pretty egregious and it went to

13   trial.  And – but I couldn't really tell much about the 720-

14   month sentence.  It seems like there were a bunch of those.

15              I assume there were others that were a lot

16   less –

17          MS. LEO:  Yes, Your Honor.

18          THE COURT:  You can just pick the ones that were the

19   most.

20              And is there – I don't know anything about those

21   cases.  I can't compare – to me every case is unique, but I

22   was sort of curious why you felt that was important for me to

23   know.  I assume it's these – they were similar?

24          MS. LEO:  Yes, Your Honor.  They were similar in

25   nature.  I know Defense counsel brought up that in other types

1  of cases where defendants received really lengthy sentences

2  it's because the child pornography was monetized or something

3  of that sort, and in these particular cases they weren't.  And

4  most of these cases are ones that I prosecuted or Ms. Zapp

5  prosecuted.  So, we're very familiar with the facts of them.

6          And they're cases that are similarly situated

7  where we have a Defendant who raped and abused a family member

8  and then either – and then, not all these cases did they go

9  ahead and distribute them, but in a good number of them, the

10  images had been distributed.

11          So, we just wanted to show to the Court, to

12  highlight to the Court in response to the Defense's argument

13  that nationally these cases are always – a lot of courts will

14  downwardly depart.  And so, it's our position that maybe that

15  does happen, but here within our District that doesn't happen,

16  that there are Guideline sentences that are imposed, which are

17  very lengthy, which are 60 years, 80 years, and then that one

18  particular case over a 1,000 years.  But, again, that's a

19  little different because it was a trial.

20          THE COURT:  So – I mean, I have sentenced – if you

21  were reading that transcript, I've sentenced a life sentence –

22          MR. ROSA-AMBERT:  A life sentence.

23          THE COURT:  -- to one.

24          MR. ROSA-AMBERT:  Yes.

25          THE COURT:  But then I downward departed on the other

1   to 20 years, I think.

2          MR. ROSA-AMBERT:  Yes, Your Honor.

3               You did.

4               I think that the other concern that I had with –

5   as the Court mentioned, they highlighted seven – eight cases

6   to be precise, which would definitely support their position.

7   However, I wanted the Court to be aware that the sentencing

8   transnationally in total of the whole CP –

9          THE COURT:  Sure.

10         MR. ROSA-AMBERT:  -- sentences it's not reflective of

11  those eight cases.  So, I think that the question before the

12  Court is what is more beneficial to the party understanding of

13  the Court those eight cases that the  Government is

14  highlighting, because they propose the idea that punishment

15  will in turn be a deterrent or national trend since 2021

16  because we have – we now have the benefit of that U. S.

17  Sentencing Commission Report saying that the Guidelines are

18  plainly wrong.  There's no other way to describe it.  They –

19  they say that the Guidelines do not reflect the idea when they

20  were originally instituted.

21              So, I – again, I think that the most accurate

22  number would be those 74 women that were sentenced on

23  identical circumstances; that information comes from the

24  Sentencing Commission, Your Honor.  Those are not the

25  statistics that I brought up for the sake of it.  That's

1  something that anyone from the public can do if they have

2  access and a little bit of knowledge as to how to use the

3  gauging tool.

4          THE COURT:  Sure.

5              And that was – that was about two hundred and

6  seventy something?

7          MR. ROSA-AMBERT:  297 was the average sentence.

8          THE COURT:  297, sure.

9          MR. ROSA-AMBERT:  And nationally, for a total

10 population of not only women – man and women in total is 360,

11 which is definitely way less than the – what the Government is

12 requesting –

13         THE COURT:  Sure.

14         MR. ROSA-AMBERT:  -- or proposing.

15         THE COURT:  Sure.

16             Again, I've sentenced less and more, and, you

17 know, I have a life sentence I gave to a CP.

18             And – but then, you know, you have the 19 year-

19 old whose got a cellphone, you know, with – that happens to

20 have child porn on it, you know, what do you do with that?

21 They use a computer.  You know, and all the – all the

22 enhancements that are in these cases, you know, it gets hidden

23 to the 19 year-old kid, so there are reasons to vary in cases.

24             Again, that last case that you've read about –

25 or the transcript of – I felt there were significant reasons

DIGITAL SCROLL TRANSCRIPTION                           281.382.9862

1   why I should vary downward further, female.

2          MR. ROSA-AMBERT:  In this particular case, Your

3   Honor, if I may, there are 10 enhancement points that would

4   essentially apply in every single case.  I detailed those out.

5   So, what's the difference between this case and a person that

6   again monetized the offense or went to trial or had a higher

7   criminal history.  For purposes of the Guidelines, it doesn't

8   matter because the level is 43, so that's mandatory life

9   whether the defendant is Category 1 or Category 6.  So, that's

10  why I wanted to create that distinction in my memo.

11         THE COURT:  Right.

12             But, I mean, I will also say the Sentencing

13  Commission has examined and re-examined these CP Guidelines.

14  This has been a topic of discussion for five, ten years.  I

15  mean, for the years I've attended their annual seminar and

16  based – you know, the Commissioners have struggled with it.

17  There's a lot of Congressional pressure, I guess, to keep them

18  where they are, and it is – they are what they are because of

19  the belief.  And I think in Congress that these are

20  appropriate.

21             And you have – and then, the Government cited

22  some discussions of our Congressmen or Senators when they – I

23  guess they were Senators when this act was adopted, so –

24  Anyway – all right, so.   So that –

25             You answered my question, Ms. Leo, about these

1   other cases.  Some of them are similar – or maybe a lot of

2   them are similar.  The outlier went to trial and lost.  It

3   seemed like a lot of them were – or all of them were males –

4   and that they were – and that they all themselves engaged in

5   sexual acts with their children.  And – but we have here a

6   female engaging in sexual acts with her child, and it's no

7   difference.

8              So – and again, this – I'll let you speak.

9   I'll let you have the floor –

10          MS. LEO:  Your Honor?

11          THE COURT:  -- and then, I can make some summary

12   comments.

13          MS. LEO:  Let me just ask – does the Court wish to

14   hear from the victim's mother?

15          THE COURT:  Yeah.  I will.  I was going to let you

16   speak –

17          MS. LEO:  Oh.  Okay.

18          THE COURT:  -- and then I was going to hear from –

19          MS. LEO:  Perfect.

20          THE COURT:  Because there may be some response, but I

21   was going to let you speak.

22          MS. LEO:  Okay.

23          THE COURT:  And then, I'll have the – does she – have

24   you ever talked to her.  Does she want to allocute?

25          MS. LEO:  Yes, Your Honor.

1              THE COURT:  Okay.

2              Go ahead.  I'll let you speak first.

3         MS. LEO:  Yes, Your Honor.

4              Your Honor, as the Court is aware of my

5    Sentencing Memorandum, the Government is requesting 60 years

6    in regards to this particular case.  We believe that it's

7    appropriate under the 3353(a) factors.

8              The Court has already gone into the report that

9    was submitted on behalf of the Defendant, Dr. Hays' report.

10   And I think that that is what is most troubling for the

11   Government was reading that report, because that report just

12   highlights how much of a danger the Defendant is to the

13   community because she has this sexual interest in children.

14   And that sexual interest in children cannot be pertur- --

15   cannot be curved in any way, shape or form.

16             Your Honor, first and foremost, as the Court

17   already brought up, the Defendant admitted that she has had a

18   sexual interest in children since she was 10 years old.  So,

19   that's more than half of her life she has been sexually

20   attracted to children.  And that was in a setting, not that

21   she was attracted to another 10 year-old, but she was

22   attracted to a baby that her mother was babysitting.

23             Further, as the Court is aware and as the report

24   indicates, she fantasizes about having sex with babies and

25   toddlers.  She fantasizes about having sex with children

1  between the age of four and seven.  She also dreams about

2  having sex with babies and toddlers and children.

3          So, this is someone who - it's as the Court

4  brought out - it's her orientation.  It's something that she

5  is going to have to live with forever.  And because of that

6  orientation and because of the fact that we know she's not

7  just looking at child pornography, but she's actually acting

8  out - she's crossed that line.  And she's abused not one child

9  but two - two children who are very young - a two-year-old and

10 a three-year-old.  And this happened on multiple times,

11 especially with the two-year-old.

12          The other thing is, Your Honor, we don't know

13 what else she has done to these children, other than what she

14 recorded herself doing to them, because they're too young to

15 outcry.  Maybe in the future they will remember what happened.

16 Hopefully, they won't.  Hopefully, this will not have affected

17 them.  But the fact of the matter is she traumatized, and she

18 harmed these children and all for what --  her own sexual

19 deviance.

20          Your Honor, as her job, her number one job

21 should have been to protect and care for minor Victim 1, but

22 she did the exact opposite when she used him, essentially, as

23 a sex toy, and that's something that cannot be tolerated.

24          And, Your Honor, the other thing is, what is

25 especially disturbing and the Court referenced this in regards

1   to the doctor's opinion about her to being a moderate to high

2   risk to re-offend.  It's not just solely on children.  It's on

3   the community at large.  And what's interesting is the

4   Defendant admitted to the doctor that she has had three

5   infractions while she's been in – in custody pending this

6   case, and two of them were in regards to drugs.  And this,

7   Your Honor, is on page 3 and 4 of the report.

8          But the third infraction deals with a write up

9   that she had received from a miscommunication with a cellmate,

10  who ended up submitting a Prison Rape Elimination Act Report

11  against her, claiming that the Defendant was being sexually

12  inappropriate and undressing in front of her, which the

13  Defendant denied doing.  But still, she was written up for

14  that.

15         The other thing that is very disturbing is that

16  to this day – and this is on page 7 – she talks about her

17  viewing herself as a sex addict and that she's constantly

18  thinking about sex and that she has stated that intrusive

19  thoughts about sex have persisted during her incarceration,

20  although she has not acted upon it.

21         So, this is someone clearly who is dangerous,

22  who is a sexual deviant, and the only way to protect the

23  public-at-large is for a lengthy term of incarceration, and

24  that's why the Government is asking for the 60 years.  We

25  believe that it's warranted under these – under the situation

DIGITAL SCROLL TRANSCRIPTION                         281.382.9862

1  and under the 3553(a) factors.

2              The other thing that Defense brought up was

3  arguing for a 20-year sentence, and I know he – Defense

4  counsel is arguing that in 20 years she'll be in her mid-

5  forties.  She'll be maybe hitting menopause.  Your Honor, for

6  someone like the Defendant –

7              First off, there is many things wrong with that

8  argument first off that someone would be in menopause at 45,

9  but secondly, that anyone in menopause wouldn't have a sexual

10 interest in children or be able to act upon it.

11             But the last and most important thing in – in

12 regards to this particular Defendant – because of the way that

13 she has had this deep-seated sexual interest, it's not going

14 to stop her.  The only way to stop her and to protect the

15 public is a lengthy term of incarceration, and that's why,

16 Your Honor, the Government is recommending and requesting that

17 a 60-year sentence would be appropriate in this case.  It

18 would be appropriate to reflect the seriousness of the

19 offense, to promote respect for the law, to provide just

20 punishment for the offense and, especially, to protect the

21 public.  So, that's why we're asking for the 60 years.

22        THE COURT:  Sure.

23        MS. LEO:  Thank you.

24        THE COURT:  All right.

25             And – so, we have a victim or a parent of a

DIGITAL SCROLL TRANSCRIPTION                     281.382.9862

1 victim here to allocute?

2          MS. LEO:  Yes, Your Honor.

3          THE COURT:  So, ma'am.  I guess I'm not going to have

4 you state your name.  We'll just all recognize that you're the

5 parent of minor MV 2, as the person is identified in the

6 Presentence Report just to protect the identity of the victim.

7               So, you get to speak here on, really, anything –

8 how relevant, how it's impacted the child, how it's impacted

9 the family dynamic, what your – in other ways that, you know,

10 your relationships within your family and others, how it's

11 affected you.

12               So, you have the floor.

13          A PARENT:  Thank you for allowing me to speak today.

14          THE COURT:  Sure.

15          A PARENT:  You know, this has really been, you know,

16 difficult to deal with, just because of the fact that I

17 trusted you to care for my child.  And, you know, I look at

18 her every day, and I don't trust anybody around my baby, no

19 one – not my father, not my mother, no one.

20               And I'm thankful that, you know, she doesn't

21 really remember anything.  She's bright.  She's beautiful.

22 She's very educated.

23          THE COURT:  About seven –

24          A PARENT:  But I really don't know what she's really

25 going to deal with in the future when she gets older, because

1   I really don't know what you really did on those days that she

2   was with you.  And she was with you for more than 8, 10 hours

3   a day.  And again, you only got caught on what you were doing.

4                I forgive you, but I will never forget.  And I

5   hope that – not really that – that you learn from it, because

6   it's, like, it's something that you have, it's something that

7   you want, but I can – I really don't –

8                THE COURT:  So, I have a few questions –

9                A PARENT:  Yes.

10                THE COURT:  -- that weren't part of the factual

11   summary.

12                So, the Defendant here, Ms. Sidney, is, loosely,

13   a sister-in-law?

14                A PARENT:  Yes.

15                THE COURT:  Okay.

16                And she – I guess you used her for child care

17   for your child?

18                A PARENT:  So, her mother would watch my daughter,

19   and I guess on the days that her mother would have to work

20   Sidney would watch her.  And so – and it's crazy, because I

21   would think about the times when I would drop off my daughter

22   she would cry.  She would cry.  And I'm, like, man, what's –

23   what's going on?  And I'm, like, okay, maybe because she's new

24   to being around her, you know.  But now, I'm thinking she was

25   crying for help, and I was ignoring that, not knowing that you

1   were doing something to her.

2           THE COURT:  And over what period of time was she –

3   were you having her drop off the – for a year, two months?

4           A PARENT:  So, I would be at work at least by 6:30

5   and get off by four, so –

6           THE COURT:  Did this –

7           A PARENT:  -- eight or nine hours.

8           THE COURT:  Did this go on for three months, six

9   months, a year –

10          A PARENT:  Uh- --

11          THE COURT:  -- two years?

12          A PARENT:  I think she watched her – they were

13  watching her for at least about six months, not that long.

14          THE COURT:  And were there other children there

15  besides –

16          A PARENT:  My daughter would get dropped off, and

17  sometimes my son would get dropped off as well.

18          THE COURT:  And –

19          A PARENT:  So, I'm not even sure if anything happened

20  to my son at this point.

21          THE COURT:  And –

22          A PARENT:  And he was three – no, he was four, and

23  she was three.

24          THE COURT:  A year older then.  Okay.

25           A PARENT:  So, she really had three kids in her

1   possession.

2            THE COURT:  Okay.

3                 And so, this happened about four years ago.  So,

4   they're in grade school now?

5            A PARENT:  Yes, sir.

6            THE COURT:  They – and you said, "smart," so

7   they're –

8            A PARENT:  G- --

9            THE COURT:  -- academically –

10            A PARENT:  GT kids.

11            THE COURT:  Doing what they should be doing?

12            A PARENT:  Doing great.

13                 I did speak to my daughter – you know, she

14   doesn't remember certain things, but again, I don't know what

15   she internally knows or remembers deep down inside.  And the

16   thing is, this is forever going to be out there.

17            THE COURT:  So, it's Sidney's mother that now has

18   her – MV 1?

19            MR. ROSA-AMBERT:  Yes, sir.

20            THE COURT:  Okay.

21                 And do you have any interaction with that child?

22            A PARENT:  No.  I do – I know he – he – he's not able

23   to speak.  He cannot talk, so.  That's another thing.

24   You're – you had a child –

25            THE COURT:  That's a physical – a genetic de- --

1   birth defect or something, or he's – he's mute?

2          MR. ROSA-AMBERT:  He has autism, Your Honor.

3          THE COURT:  Autism.

4          MR. ROSA-AMBERG:  But that was before, obviously.

5          THE COURT:  Sure.

6          A PARENT:  I mean, I don't have anything else to say.

7   I just, you know, want you to know I hope that, you know, I

8   get justice, not only for my child, but for your son as well.

9          THE COURT:  Wow.  I didn't catch that.  Was that in

10  the Presentence Report?  I totally missed that the child was

11  autistic.

12         MS. LEO:  It's actually in one of the letters that

13  the Defense had submitted.

14         THE COURT:  Okay.

15         MS. LEO:  I think from the Defendant's mother who

16  wrote about taking care of him and him being autistic.

17         THE COURT:  Okay.

18              All right.  So – I mean, you've answered my

19  questions.  I'm sorry for all of this for you and your family

20  and your children.

21              Hopefully, someday, your children are – or your

22  daughter is experiencing – or I'm sorry – your son is

23  experiencing problems – I'm sorry – your daughter – excuse

24  me – that, you know, you'll – you won't ignore it.  You know,

25  you'll get them counseling and help.

1             A PARENT:  Yes, sir.

2             THE COURT:  All right.

3                  Thank you very much.

4             A PARENT:  Thank you.

5             THE COURT:  You may be seated.

6                  All right.  And the grandmother is not here.

7             MS. LEO:  No, Your Honor.

8             THE COURT:  Okay.

9             MR. ROSA-AMBERT:  Your Honor, but grand- --

10            THE COURT:  You were making some notes.  You want to

11   reply?

12            MR. ROSA-AMEERT:  Grandfather is here.  He's over my

13   left shoulder.

14            THE COURT:  Okay.

15            MR. ROSA-AMBERT:  They don't live together.  Also, is

16   the stepmother, Ms. Elexis' stepmother is here and her

17   grandmother, her own grandmother.  So, it would be that great

18   grandmother of the – of MV 1.

19            THE COURT:  Okay.

20                 Did you want to respond to anything?

21                 I mean, you did in our reply brief, but you

22   looked like you were jotting down some things, like maybe you

23   were going to correct something that Ms. Leo said.  No?

24            MR. ROSA-AMBERT:  I – I think that the problem that I

25   have with the Government's position, Your Honor, is, one,

1    they're asking the Court just to focus on the nature and

2    characteristics of the offense and just outright forget about

3    the whole set of all the 3553(a) factors.

4              Like, the other issue or the other problem that

5    I have with this whole idea is that the Government doesn't

6    seem to believe that their own treatment in BOP would work.

7    Right?  We just don't know that.  The rest is pure

8    speculation.  But we know that because of this – of her age

9    she has the opportunity to be redeemable, Your Honor.

10         THE COURT:  Yeah, I don't know if it works.  I do

11   know I have had a case where he was – he went to jail for

12   sexual assault of a minor, spent 20 years in state prison,

13   came out – again, this is a gentleman that looks to be about

14   70 years old – and then engaged in the production and

15   distribution of child pornography.  And so, I don't know what

16   kind of treatment there is, but obviously for him it was a

17   complete failure because he recidivated, I mean, within six

18   months of getting out.

19              So, he was not allowed to have a cellphone, but

20   he went and got one in another person's name and then was

21   using the cellphone, engaged in distribution of child

22   pornography.

23              So, I don't know what it is.  It's hard to

24   predict.  I think the key thing that the Government has

25   emphasized is the likelihood or threat for recidivism or the

1   risk of recidivism here.  I think – you know, that even the –

2   you know, none of us are professionals.  We look at empirical

3   data, but the evaluator here put a lot of weight on what the

4   expert says about this.  They understand the psychology more

5   than any of us do, and he seems to have a lot of concern about

6   this.

7           MR. ROSA-AMBERT:  I – I think that the question would

8   be whether he would have the same concerns 20 years from now

9   or 25 and 30.

10          THE COURT:  Sure.

11          MR. ROSA-AMBERT:  And that – that's the real question

12  before the Court.

13          THE COURT:  Right.

14              And I think at some point – right.

15          MR. ROSA-AMBERT:  I think that he had it at the time,

16  because –

17          THE COURT:  Sure.

18          MR. ROSA-AMBERT:  Or she had it, because it's a

19  female evaluator.  I think that Dr. Missen (phonetic) Hays had

20  that worry at the time, because that's the information that

21  the client is providing.  And I don't think she should be

22  penalized for being honest, quite the opposite, like, the

23  information is coming from here.  Just because she

24  acknowledges that she has a problem and she acknowledges that

25  she needs treatment, as she has done before the Court today as

1   well.

2          THE COURT:  But that's the whole point is – she has

3   to be candid with the evaluator, so the evaluator –

4          MR. ROSA-AMBERT:  Yes.

5          THE COURT:  -- can make a good evaluation.  And –

6          MR. ROSA-AMBERT:  And she was.

7          THE COURT:  -- she was, and he – but he took those

8   bits of information and evaluated them, deliberated on them

9   and then wrote his report – or her report – excuse me – it's a

10  female – and it is of the conclusion, a pretty strong

11  conclusion that Ms. Sidney has a risk of recidivating.

12         MR. ROSA-AMBERT:  Your Honor, if I may regarding

13  that.  I do agree that that was the conclusion, but she also

14  provided a detailed account as to what she would believe would

15  be necessary to lower that recidi- -- recidivism rate.

16         THE COURT:  Sure.

17         MR. ROSA-AMBERT:  I – she believes that that is

18  present right now but she doesn't make any opinion as to

19  what's going to happen in the future.  However, she does

20  believe that that risk would lower if she complies with the

21  recommendation she proposed in the – in the report.

22         THE COURT:  All right.  I'll consider that.

23             All right.  I believe I've heard enough.  My

24  initial evaluation of this case is unchanged.

25                 Let me pull up, so that I can recite all of the

1    special conditions of supervision that are going to have to be

2    placed on Ms. Sidney.  Let me pull up the Presentence Report

3    here - and the Counts.

4              All right.  So, the Court does adopt the factual

5    findings contained within the Presentence Report.  I do find

6    it all correctly scored, and as a consequence she comes out

7    to, you know, a level 43, which under the Guidelines is - is

8    life.

9              However, the Court believes a life sentence

10   doesn't satisfy the 3553(a) factors and even the Government is

11   not suggesting a life sentence but rather a 60-year sentence.

12   And so, I'm going to make a variance, just given the

13   circumstances of this case, her age, when she will complete

14   her prison sentence.  And the length of the sentence that I'm

15   going to pronounce I believe will be sufficient deterrence to

16   others, will be just punishment, will show respect for the law

17   and those other 3553(a) factors.

18              As to Count 1, it is the judgment of the Court

19   that the Defendant is committed to the custody of the Bureau

20   of Prisons for a term of 30 years.  That's the maximum on that

21   Count.

22              And as to Count 2, 3 and 4, the Court sentences

23   Ms. Sidney to 10 years to run consecutively to Count 1.

24              On all four Counts, the Court - I'm sorry - on

25   Counts 2, 3 and 4 three years of supervision; as to Count 1,

1  lifetime supervision.

2           And while on supervision, the Defendant is not

3  to commit any other federal, state or local crime.  She's to

4  comply with the standard conditions adopted by this Court,

5  abide by any mandatory conditions required by law.

6           In addition, she's not to possess a firearm or

7  other destructive device; cooperate with providing a DNA

8  sample.

9           And I impose the following special conditions:

10          First, she's to have no contact with any of the

11 victims.  However, she may have contact with minor Victim 1,

12 her son, if requested and initiated by her son.  And that all

13 need to be – she'll need to get permission, though, with her

14 Probation Officer to return any contact that's initiated by

15 her son.

16          And in addition, she is required to register

17 with the Sex Offender Registration Notification Act or any

18 state sex offender registration agency in which she may

19 reside, work or be a student.

20          In addition, she must not have direct contact

21 with any child she knows or reasonably should know to be under

22 the age of 18 without the permission of the Probation Officer.

23 If you do have any direct contact, you should advise your

24 Probation Officer within 24 hours – contacting through written

25 communication, in prison communication or physical contact or

1    through social media or the internet, any sort of social

2    website.

3              You must not possess or view pornographic

4    materials.

5              Let's see.

6              You are – you're required to permit your

7    Probation Officer to access any computer or electronic device

8    that you may own upon request without any prior notice to you,

9    so they may randomly monitor any form of computer electronic

10   device that you may own in the future, such as a cellphone.

11             Let's see.

12             You must participate in a Sex Offender Treatment

13   Program with all the rules and regulations of that program

14   until you complete it with the approval of the Probation

15   Officer and Program Director.

16             You must not preside, work, access or loiter

17   within 100 feet of schoolyards, playgrounds, or other places

18   primarily used by children, such as a Boys and Girls Club

19   without approval by your Probation Officer.

20             You must not seek or maintain employment,

21   supervise or volunteer or participate in any program or

22   activity where minors under the age of 18 would congregate

23   without prior written approval of your Probation Officer.

24             All right.  So, those are your special

25   conditions of supervision.  Now, let me pull up –

1          The Court is also going to order a special

2    assessment of $100 as to each Count for a total of $400.

3          I find the Defendant indigent, so I waive any

4    fine.  However, I'm going to order restitution to the six

5    victims, and the Court is going to order the three-thousand-

6    dollar statutory minimum amount as to all six victims.  And

7    that'll be payable within 90 days of her release – I'm sorry.

8          The Court will order that payable now, so that

9    it can be taken out of her earnings while at the BOP, so order

10   that payable immediately.

11          Is there anything I've left out?

12          MS. LEO:  Your Honor, just for clarification

13   purposes, the supervised release, the length of term for Count

14   1 was that life then?

15          THE COURT:  That's the life.

16          MS. LEO:  Okay.

17          THE COURT:  Yeah.  And the others I think the max is

18   three years on those?

19          MR. ROSA-AMBERT:  Three years, yes.

20          MS. LEO:  The minimum – the minimum is five years,

21   Your Honor.

22          THE COURT:  The minimum is five years on the others?

23          MS. LEO:  Yes.  Yes, Your Honor.

24          THE COURT:  Oh, okay.  Well, then five years on those

25   to run concurrent.

1          MS. LEO:  Thank you, Your Honor.

2          THE COURT:  Anything else I missed?

3          PROBATION OFFICER:  Your Honor, just for

4    clarification for the judgment.  The total amount of

5    incarceration here is 40 years, correct?

6          THE COURT:  Correct, 480 months.

7          PROBATION OFFICER:  And I - I believe those were the

8    same special conditions that were listed in the PSR, right?

9          THE COURT:  Correct.  That's where I was reading

10   from.

11         PROBATION OFFICER:  Okay.  I thought there were two I

12   didn't hear.  You must warn of any other people who are using

13   computers, and then you should not subscribe to any other

14   computer online service?  It is just -

15         THE COURT:  Yeah.  I didn't - I'm going to allow

16   the - well, I'll add the - I must have missed the online

17   computer service.

18              How does that read, so that Ms. Sidney can know

19   what it is, if you wouldn't mind reading it.

20         PROBATION OFFICER:  You shall not subscribe to any

21   computer online service nor should you access any internet

22   service during the length of your supervision unless approved

23   in advance in writing by the U. S. Probation Officer.

24         THE COURT:  That's so vague.

25         PROBATION OFFICER:  And may not -

1        THE COURT:  That's too vague.

2        PROBATION OFFICER:  Okay.

3        THE COURT:  For example, if she wanted to look for a

4   job, could she go on the internet to look for a job?  You

5   know, I want her to be able to do that.

6        PROBATION OFFICER:  Okay.

7        THE COURT:  I want her to be able to report to the

8   Probation Office electronically like they're permitted to do

9   from a computer.  That's why I didn't band her from owning

10  electronic devices.  I just want the Probation Officer to have

11  the ability to make unannounced inspections of her computer

12  and electronic devices.  So, I'm not going to add that

13  restriction.

14       PROBATION OFFICER:  Okay.

15       THE COURT:  She is permitted to access – you can't

16  function in our society without an electronic device.

17       PROBATION OFFICER:  And you did say the other

18  condition about warning others to use the computers; we're not

19  including that one?

20       THE COURT:  I'm not including that one either,

21  correct.

22            All right.

23            So, this is your sentence.  Ms. Sidney, you can

24  appeal; you will have two weeks to do so.  You know, there

25  are – this is a lengthy sentence.  I know you're going to be

1    70 years or just under that, I think, when you get out – maybe

2    67.

3              You will get good time credit or 15% off that,

4    so that's probably going to knock another several years off of

5    it – five years or so.  And there are – well, I don't know if

6    you can early release on – get a year off for the drug

7    program.  I doubt it for this offense.  Yeah, for this

8    offense, I don't think you're going to be eligible for that.

9              But –

10             MR. ROSA-AMBERT:  Your Honor, just in the sake of

11   caution, could you recommend that she be eligible for the RDAP

12   program in the off chance that she does get benefit?

13             THE COURT:  Yeah.  I mean, I'll recommend she be

14   placed so –

15             MR. ROSA-AMBERT:  Thank you.

16             THE COURT:  -- so that she can benefit from the RDAP

17   program, but the biggest priority is she's got to be in a

18   facility where she can have her Sex Offender Treatment

19   Program, and there are only two such facilities in the country

20   I think that have those programs.  They try to put all –

21             MR. ROSA-AMBERT:  There are 14; there's two in Texas,

22   Your Honor.

23             THE COURT:  Two in Texas.  Okay.

24             MR. ROSA-AMBERT:  Yes.

25             THE COURT:  Well, that's likely where you will be is

59

1    one of these two in Texas.

2              All right.  Anything else I need to add?

3              PROBATION OFFICER:  Just one more clarification, Your

4    Honor –

5              THE COURT:  Sure.

6              PROBATION OFFICER:  -- from Probation.

7                   In regard to the other special assessments, are

8    those waived as well, the judgment for victims in trafficking

9    and the ADEA?

10             THE COURT:  Those are the third – so, obviously, my

11   priority is that the victims get their funds first, and

12   there's just no way to pay the other – she's never going to be

13   able to even pay the victims is my belief, given just the

14   constraints of her employment, her age and just her ability to

15   pay.  So, I'll waive those others, you know, again, finding

16   her indigent.

17             All right.  Anything else?

18             MS. LEO:  Your Honor, the Government does have an

19   Order of Forfeiture at sentencing for the Court.

20             THE COURT:  So, I saw Judge Miller enter a

21   Preliminary Order of Forfeiture.  This is just on her device,

22   the devices?

23             MS. LEO:  Yes.  Yes, Your Honor.

24             THE COURT:  Okay.

25                   Any objection to that, the forfeitures?

DIGITAL SCROLL TRANSCRIPTION                      281.382.9862

```
 1              MR. ROSA-AMBERT:  No.  No, sir.  Of course not.

 2              THE COURT:  All right.  The Court will order them

 3    forfeited.

 4                   Can you –

 5              MS. LEO:  Or do you want me – I'm sorry, Your Honor.

 6              THE COURT:  Yeah.  We don't –

 7              MS. LEO:  I can file it if that will give the

 8    Court – to give her.

 9              THE COURT:  File it; it will get signed.

10              MS. LEO:  Okay.

11              THE COURT:  It's a motion?

12              MS. LEO:  It's just the Order –

13              THE COURT:  For a final –

14              MS. LEO:  -- of Forfeiture.

15              THE COURT:  Okay.  So, you're going to orally move

16    that I enter the Final Order of Forfeiture?

17              MS. LEO:  Yes, Your Honor.

18              THE COURT:  All right.  And if you could e-mail

19    Mr. Rodriguez or e-file it, and I'll get it signed.

20              MS. LEO:  Yes, Your Hono

21                   I apologize.

22              THE COURT:  All right.

23                   Thank you.

24                   You're excused.

25         (Proceedings concluded at 10:26:37 a.m.)
```

DIGITAL SCROLL TRANSCRIPTION                         281.382.9862

61

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                              HOUSTON DIVISION

4

5        I, Linda Griffin, court approved transcriber, certify that

6    the foregoing is a correct transcript from the official

7    electronic sound recording of the proceedings in the above-

8    entitled matter.

9

10   /s/ Linda Griffin                        October 13, 2023
     Linda Griffin                                 Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862